**EMI CATALOGUE PARTNERSHIP and EMI Robbins Catalog Inc., Plaintiffs–Appellants,**

v.

**HILL, HOLLIDAY, CONNORS, COSMOPULOS INC. and Spalding Sports Worldwide, Defendants–Appellees.**

No. 99–7922.

United States Court of Appeals, Second Circuit.

Argued: Jan. 24, 2000

Decided: Sept. 15, 2000

58

Brendan J. O'Rourke, New York, New York (Charles B. Ortner, William M. Hart, Frank P. Scibilia, Proskauer Rose LLP, New York, New York, of counsel), for Plaintiffs–Appellants.

Marcia B. Paul, New York, New York (Lisa S. Hughes, Kay Collyer & Boose LLP, New York, New York, of counsel), for Defendants–Appellees.

Before: CARDAMONE, STRAUB, Circuit Judges, and CARMAN[*], Judge.

CARDAMONE, Circuit Judge:

At the heart of the litigation before us on this appeal is a jazz tune popularized by the well-known swing clarinetist Benny Goodman. The song entitled "Sing, Sing, Sing (With a Swing)" is one of the most recognizable from the height of the swing era in the 1930s. A 1999 poll of National Public Radio listeners named it one of the 100 most important musical works of the 20th century. In the instant trademark suit, plaintiffs, the current holders of rights to the song, sought to prevent defendants infringing those rights by using an alliterative version of the song's title backed by music similar to "Sing, Sing, Sing" in a TV commercial for golf clubs. For those familiar with the Benny Goodman version of it with its upbeat syncopation and counterpoint, "Sing, Sing, Sing" is as distinctive and recognizable as the opening four notes of Beethoven's Fifth Symphony are to a classical music lover. Following abbreviated discovery, plaintiffs' suit was dismissed by the grant of summary judgment to defendants. We think further proceedings warranted, and hence remand.

## BACKGROUND

Plaintiff EMI Catalogue Partnership and EMI Robbins Catalog Inc. (collectively EMI) own and administer all rights in the song "Sing, Sing, Sing (With a Swing)" ("Sing, Sing, Sing" or song) and its title. This song, a Louis Prima composition, was popularized by Benny Goodman and turned out to be one of his most famous and enduring. *See* Ross Firestone, *Swing, Swing, Swing: The Life and Times of Benny Goodman* 161 (1993). A recording of it was hailed as one of the best known records of the big band era. *See* James Lincoln Collier, *Benny Goodman and the Swing Era* 241 (1989). Among the rights EMI asserts that it owns in the song are the right to license it for advertising or other commercial uses, and the right to use and license the title "Sing, Sing, Sing (With a Swing)." EMI has earned over $4.7 million mostly from films and commercials during the 63 years it has licensed those rights.

Defendant Spalding Sports Worldwide (Spalding) is the well-known manufacturer of golf clubs and golfing equipment. In the fall of 1997 it commissioned defendant advertising agency Hill, Holliday, Connors, Cosmopulos Inc. (Hill Holliday) to create a 30–second television spot for a line of golf clubs Spalding planned to sell under the trademark "Top–Flite Tour Irons." Hill Holliday initially conceived a commercial with footage of golfers hitting shots that

* Hon. Gregory W. Carman, Chief Judge, United States Court of International Trade, sitting by designation.

featured a swing music background soundtrack.

The commercial's original mockup began with images of three golfers hitting iron shots, followed by a black screen displaying the phrase "Swing, Swing, Swing" in white letters, which appears for about one second. The music playing behind the action in the mockup was a recording of "Sing, Sing, Sing." The commercial continued with images of golfers, spectators, and the golf clubs, interspersed with four additional one-second shots displaying a black screen with a different text in each. The text in these shots were, in order: Spalding's "Top–Flite Tour Irons" trademark; "Played by Over 100 Tour Pros;" "22 Victories Worldwide;" and "The #1 Iron on the Senior PGA Tour." The mockup concluded with the words "They Work for Them. They'll Work for You" on a black screen and an image of a golf club head with the logo "Top–Flite Pro Irons" appearing above it.

Although Spalding liked the commercial's concept, the cost of licensing "Sing, Sing, Sing" exceeded its budget. So it had Hill Holliday create instead a final version of the commercial with essentially the same visual images just described, but it licensed stock music in a swing style for the soundtrack. The final version—the one that prompted the instant litigation—begins with a closeup of the head of an iron addressing a ball and an image of irons in a golf bag, followed by the phrase "Swing Swing Swing" superimposed on the image. The subsequent images and words are similar to those in the mockup, except that the phrases are superimposed on images of greens and clubs rather than appearing on black backgrounds. The "Top–Flite Pro Irons" and related logos appear several times.

To obtain the stock swing music, Hill Holliday asked a sound studio to search for a "Benny Goodman-type song like 'Swing Swing Swing,'" confusing the name of the song in its request. The studio found ten alternatives from which Hill Hol-liday picked the tune used in the final commercial. The parties disagree whether the music chosen for the commercial is in the same style as the song, or whether it is evocative or imitative of it.

In June 1998 plaintiff wrote defendant Hill Holliday telling the advertising agency that the combination of the phrase "Swing Swing Swing" in the commercial together with music evocative of the song would confuse consumers into associating the song and its title with Spalding's golf clubs. It demanded defendant cease using the commercial. Hill Holliday responded to this demand by stating that it used the phrase "Swing Swing Swing" to describe the golfers shown swinging their clubs, and it gave details explaining the use of the stock music it had licensed for the commercial.

When defendant refused to pull the commercials, EMI filed suit in the United States District Court for the Southern District of New York (Sweet, J.) on November 10, 1998, seeking an injunction and damages for unfair competition in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(Act) and of state law. As it had in its cease and desist letter, EMI in its complaint alleged that "[d]efendants' adoption and use of the title and slogan 'Swing, Swing, Swing' ... conjoined with music evocative of the well-known musical composition 'Sing, Sing, Sing (With A Swing),' constitute an unlawful use of that title and slogan which is likely to cause mistake, confusion and/or deception as to the sponsorship, affiliation or endorsement of Spalding's products and the marketing thereof with EMI." In its answer, Hill Holliday raised as one of several affirmative defenses that its commercial constituted fair use protected under the First Amendment, since it described both the action of the players depicted in it and the musical style used in the soundtrack.

On February 17, 1999 defendants moved for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c) or, in the alternative,

for summary judgment pursuant to Fed. R.Civ.P. 56. The district court treated the motion as one for summary judgment. For the purposes of their motion, defendants conceded that EMI had a right protectable under § 43(a) in the title to the song and that the title had acquired secondary meaning among consumers. The district court found it unnecessary to go beyond the initial, partial discovery the parties had been afforded, or to reach the issue of likelihood of confusion. Instead, it ruled that defendants' use of the phrase "Swing Swing Swing" constituted fair use. After outlining the applicable law, the district court determined that the commercial, including the words "Swing Swing Swing" followed by images of three golfers swinging, "describes the action which Spalding hopes golfers will take using their product." It found the use "doubly descriptive" because the phrase also describes the style of music on the soundtrack, and found that Spalding's display of the Top–Flite name and logo three times in the commercial sufficiently indicated the origin and sponsorship of the product shown.

The district court also rejected EMI's argument that defendants acted in bad faith with the intent to misappropriate EMI's good will in the song's title. It ruled that any connection between the title, swing music, and Spalding's clubs "is caused by the description of the music and golfers' actions and thus is incidental to that fair use," thereby precluding a finding of bad faith. It found instead evidence of good faith because Spalding displayed its logo in the commercial three times. EMI appeals. We reverse.

## DISCUSSION

We review a grant of summary judgment *de novo, see Tri–Star Pictures, Inc. v. Leisure Time Prods., B.V.,* 17 F.3d 38, 43 (2d Cir.1994), granting such relief only if there are *no* genuine issues of material fact and the moving party establishes its right to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). In deciding a motion for summary judgment, all ambiguities must be resolved and all reasonable inferences drawn in favor of the party opposing the motion. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Some caution must be observed in granting this remedy in a suit alleging unfair competition under the Lanham Act because defendant's intent is at issue. *See Resource Developers, Inc. v. Statue of Liberty–Ellis Island Found., Inc.,* 926 F.2d 134, 141 (2d Cir.1991).

## I EMI's Claim under the Lanham Act

### A. *Nature of an Unfair Competition Claim under § 43(a)*

Section 43(a) of the Lanham Act prohibits any person from using in commerce, in connection with any goods, "any word, term, name, symbol, or device, or any combination thereof ... which ... is likely to cause confusion, or to cause mistake, or to deceive ... as to the origin, sponsorship, or approval of his or her goods ... by another person." 15 U.S.C. § 1125(a)(1).

The purpose of this section is "to prevent consumer confusion regarding a product's source ... and to enable those that fashion a product to differentiate it from others on the market." *Centaur Communications, Ltd. v. A/S/M Communications, Inc.,* 830 F.2d 1217, 1220 (2d Cir.1987); *cf. Paddington Corp. v. Attiki Importers & Distribs., Inc.,* 996 F.2d 577, 585 (2d Cir.1993). The section protects unregistered trademarks from infringement. *See Genesee Brewing Co. v. Stroh Brewing Co.,* 124 F.3d 137, 142 (2d Cir. 1997). Thus, the central inquiry where there is a claim of consumer confusion with regard to association of a product with another person's mark is the "likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Mushroom*

*Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir.1978).

■■ If consumers believe that the trademark owner sponsors or endorses the use of the challenged mark, the confusion requirement is satisfied. *See Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 204–05 (2d Cir. 1979). Whether a likelihood of confusion exists is determined by applying the eight-factor test first set forth by Judge Friendly in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir.1961). Although the district court did not reach the issue of likelihood of confusion, we mention the *Polaroid* test because defendants' good faith, discussed later, is informed by the discussion of that factor in *Polaroid.*

### B. Scope of EMI's Mark in "Sing Sing Sing (With a Swing)"

In this case, EMI claims that its mark in the song consists of both the title "Sing, Sing, Sing (With a Swing)" *and* the music itself. It therefore contends it was error for the trial court, when conducting its fair use analysis, to focus solely on defendants' use of the phrase "Swing Swing Swing," while ignoring the evocative music used in the commercial. EMI has no rights to the music as a trademark, but any similarity between it and the stock music actually used in the commercial is relevant to a fair use analysis.

■■ A plaintiff claiming unfair competition under § 43(a) must show that it owns a valid trademark eligible for protection. *See Thompson Med. Co. v. Pfizer Inc.*, 753 F.2d 208, 215 (2d Cir.1985) ("The starting point of our examination [of a claim under § 43(a)] is determining whether a mark is eligible for protection."). EMI does not own a registered mark in either song or title, but unregistered trademarks are, as noted, protected by § 43(a). Although § 43(a) prohibits a broader range of practices than does § 32 of the Lanham Act, which protects marks registered pursuant to § 2, the Supreme Court explains "that the general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a)." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992).

■ The Act defines the term "trademark" to include "any word, name, symbol, or device, or any combination thereof ... used by a person ... to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C. § 1127. In expanding the universe of symbols and devices eligible for trademark protection, the Supreme Court has identified other attributes that are capable of conveying meaning to a consumer, for example, the shape of a product, its scent, a particular sound, and color. These attributes of a product are entitled to protection under the Lanham Act. *See Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 162, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995).

These characteristics all serve as indicators of the source of the goods and distinguish those goods from others in the marketplace. *See id.* at 163, 115 S.Ct. 1300. A mark's source-distinguishing ability allows it to serve those basic purposes that gave birth to trademark law in the first place; that is, to ensure that a product's maker reaps the rewards of the reputation it has built, and to enable consumers to recognize and repurchase goods with which they have previously been satisfied. *See id.* at 164, 115 S.Ct. 1300; 3 Louis Altman, *The Law of Unfair Competition, Trademarks and Monopolies by Rudolf Callmann* § 17.01, at 17–1 to 17–3 (4th ed.1998); 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 2:3, at 2–3 (4th ed.2000).

■ Titles of works of artistic expression, including films, plays, books, and songs, that have acquired secondary meaning are protected from unfair competition under § 43(a). *See Rogers v. Grimaldi*, 875 F.2d 994, 997–98 (2d Cir.1989); 2 McCarthy, *supra*, §§ 10:1–:18 at 10–4 to 10–36; *see also Tri–Star Pictures*, 17 F.3d at 43; *Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.*, 996 F.2d 1366, 1379 (2d Cir.1993); 3 Altman, *supra*, § 17.22 at 17–95 to 17–97. Courts also have found that other distinctive identifying features merit protection as marks under § 43(a), including an entertainer's distinctive voice, a celebrity's persona, and even the distinctive features of a car used in a television program. *See Waits v. Frito–Lay, Inc.*, 978 F.2d 1093, 1107 (9th Cir.1992) (as amended) (distinctive vocal style); *White v. Samsung Elecs. Am., Inc.*, 971 F.2d 1395, 1400 (9th Cir.1992) (celebrity's persona); *Warner Bros., Inc. v. Gay Toys, Inc.*, 658 F.2d 76, 78 (2d Cir.1981) (distinctive elements of television series); *Allen v. National Video, Inc.*, 610 F.Supp. 612, 627 (S.D.N.Y.1985) (celebrity's persona); 4 McCarthy, *supra*, § 27:88–:89, at 27–134 to 27–138.

## C. *Claim that Song Serves as a Trademark for Itself*

■ Whether the Lanham Act goes beyond protecting a work's title to protecting its corpus as a mark for the work is a novel question. In effect, EMI asks that we recognize the musical composition itself as a mark for itself that can be protected under § 43(a) of the Act. Because this would be tantamount to saying that a product itself—in this case, the song—can serve as its own trademark, we decline to do so.

■ EMI's claim that the song itself serves as a "symbol or device" that indicates its source misapprehends the distinctions between copyright and trademark protection. Trademark law is concerned with protection of the symbols, elements or devices used to identify a product in the marketplace and to prevent confusion as to its source. It does not protect the content of a creative work of artistic expression as a trademark for itself. Copyright law protects the artist's right in an abstract design or other creative work. *See United States v. Giles*, 213 F.3d 1247, 1252 (10th Cir.2000) ("A trademark is meant to identify goods so that a customer will not be confused as to their source. A copyright is intended to protect the owner's right in an abstract design or other creative product."); 1 McCarthy, *supra*, § 6:3, at 6–6. The title of a song certainly may fulfill the source– or product-identifying function of a mark. However, the musical composition itself *is* the product. The score, or unique combination of notes, are the essence of a song, just as architecture combines different materials into a structure whose volume then creates a unique spatial relationship to the site it occupies. Intellectual property law protects the owners' rights in these unique combinations in distinct ways that lie outside the realm of trademark law. The different purposes of trademark and copyright law bear on the different rights each law creates.

■ Copyright law, not trademark law, is the primary vehicle for protecting the rights of a song's composer or her successor in interest in the musical composition. Musical works "fixed in any tangible medium of expression" are protected by 17 U.S.C. § 102(a). Ownership of a copyright gives the owner exclusive rights to reproduce the work in copies or phonorecords, prepare derivative works, and to distribute copies or phonorecords of the copyrighted work. *See id.* § 106.

The Supreme Court has stressed that there are "fundamental differences between copyright law and trademark law." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 439 n. 19, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984). Copyright law has its roots in the Constitution. U.S. Const. art. I, sect. 8(8). It protects "fruits of intellectual labor," such as literary or dramatic works, musical compositions, motion pictures, sound recordings, architectural works, and other similar orig-

inal works of authorship. *Trade–Mark Cases,* 100 U.S. 82, 94, 25 L.Ed. 550 (1879); *see* 17 U.S.C. § 102. A trademark, by way of contrast, grows out of the adoption and use of a distinctive symbol by the party using it. Its function "is simply to designate the goods as the product of a particular trader and to protect his good will against the sale of another's product as his." *United Drug Co. v. Theodore Rectanus Co.,* 248 U.S. 90, 97, 39 S.Ct. 48, 63 L.Ed. 141 (1918).

Applying these principles to a musical composition, a trademark must be derivative of the original work, used to identify that work or its source. The creation and expression of an original work is protected by copyright law, and once an original work has been produced trademark law is not the proper means of protecting the rights in this originality. *See Duraco Prods., Inc. v. Joy Plastic Enters., Ltd.,* 40 F.3d 1431, 1446 (3d Cir.1994) ("[I]t is not the purpose of unfair competition law, under the guise of either consumer protection or the protection of business good will, to implement a policy of encouraging innovative designs by protecting them once designed.... Those issues are the province of copyright and patent laws."). The work itself is protected from misappropriation by the copyright laws. The different, source-identifying function of trademarks requires that a trademark in a musical composition not be coextensive with the music itself. Rather, the trademark serves to identify the copyrighted music.

We hold therefore that a musical composition cannot be protected as its own trademark under the Lanham Act. A contrary conclusion would allow any copyright claim for infringement of rights in a musical composition to be converted automatically into a Lanham Act cause of action. While there are many cases in which both claims are appropriate, cases involving trademark infringement should be those alleging the appropriation of symbols or devices that identify the composition or its source, not the appropriation or copying or imitation of the composition itself. Concluding that a song can serve as an identifying mark of the song itself would stretch the definition of trademark—and the protection afforded under § 43(a)—too far and give trademark law a role in protecting the very essence of the song, an unwarranted extension into an area already protected by copyright law.

## II  Fair Use Analysis

### A.  Descriptive Use

#### 1.  Descriptive Use of Protected Marks

■ Although the composition "Sing, Sing, Sing (With a Swing)" is not protected as a trademark for itself under 43(a) of the Lanham Act, this does not end our inquiry into the district court's fair use analysis. For purposes of this motion, defendants have conceded that EMI has trademark rights in the song title. To come within the fair use defense, defendants must have made use of EMI's mark "Sing, Sing, Sing" (1) other than as a mark, (2) in a descriptive sense, and (3) in good faith. *See* 15 U.S.C. § 1115(b)(4); *Cosmetically Sealed Inds., Inc. v. Chesebrough–Pond's USA Co.,* 125 F.3d 28, 30–31 (2d Cir.1997). In this case, defendants did not use the phrase "Swing Swing Swing" as a mark, but the parties vigorously dispute whether the phrase made use of plaintiffs' mark or was only descriptive of Spalding's product and used in good faith.

■ The fair use doctrine permits use of a protected mark by others to describe certain aspects of the user's own goods. *See Car–Freshner Corp. v. S.C. Johnson & Son, Inc.,* 70 F.3d 267, 270 (2d Cir.1995). Because the owner's rights in a mark extend only to its significance as an identifying source, not to the original descriptive meanings of a mark, it is sometimes difficult to tell what factors must be considered to determine whether a use is fair because it is descriptive. We have looked at whether the mark used describes certain aspects of the alleged infringer's own goods, and whether the mark as used describes an action the alleged infringer

hopes consumers will make of its product. *See Cosmetically Sealed,* 125 F.3d at 30; *Car–Freshner,* 70 F.3d at 270. The Restatement (Third) of Unfair Competition adopts as a relevant factor the "physical nature of the use in terms of size, location, and other characteristics in comparison with the appearance of other descriptive matter or other trademarks." *Restatement (Third) of Unfair Competition* § 28 cmt. c. (1995).

The Restatement also observes that the scope of the fair use should be related to the degree to which the descriptive meaning is relevant to the goods with which it is associated in the alleged infringement, and whether there are other terms available to describe the pertinent characteristic. *See id.* Where a mark incorporates a term that is the only reasonably available means of describing a characteristic of another's goods, the other's use of that term in a descriptive sense is usually protected by the fair use doctrine. *See New Kids on the Block v. News Am. Publ'g, Inc.,* 971 F.2d 302, 308 (9th Cir.1992); 2 McCarthy, *supra,* § 10:14 at 10–26 ("Since the use of a descriptive title cannot serve to prevent others from using the title in a descriptive, non-trademark sense, others may be able to use the title as the only term available.").

Whether a use is descriptive must be determined by assessing the manner in which the mark is used with respect to the product or service sold by the alleged infringer. How the senior mark holder used the mark in conjunction with its own product is not relevant to this inquiry. Because we conclude that EMI's mark is limited to the song's title, consideration of factors such as its melody and the tune of the stock music used by defendants is not appropriate in deciding whether defendants' use was descriptive, although it would be relevant to a likelihood of confusion analysis. The district court properly took into consideration only whether the phrase "Swing Swing Swing" as it appeared in the commercial was used as descriptive of Spalding's products and of the genre of music adopted as the soundtrack. The trial court correctly refused to take into account whether the music used was evocative or imitative of the song in determining whether defendants' use of "Swing Swing Swing" was descriptive.

### 2. Defendants' Descriptive Use of "Swing Swing Swing"

The court further concluded that defendants used the phrase "Swing Swing Swing" in a descriptive sense. "Swing" undoubtedly describes both the action of using a golf club and the style of music used in the soundtrack. Had the single word "Swing" appeared in the commercial, it could not be doubted that defendants' use was descriptive. However, it was error to rule that the alliterative phrase actually used was necessarily identical to the single descriptive word.

While "Swing" is descriptive, "Swing Swing Swing" is not necessarily so. The explanation that the word describing the action must be repeated three times to describe the three actors shown hitting golf shots is tenuous when the ordinary term for their action involves the single word "swing," "hit," "stroke," or "shot." Spalding hopes individual consumers will "swing" its irons, presumably after having "bought" them, not "swing swing swing" its irons. The argument that the phrase as a whole describes the genre of music in the soundtrack is patently incorrect, as it is "swing" music, not "swing swing swing" music.

Defendants also maintain that there is no other way than "swing" to describe the action of using a golf club. Because "Swing" alone, or "Hit It!" might have served equally well to describe the desired action and allude to the genre of music playing behind the commercial, defendants' argument overstates the uniqueness of the phrase used as a means to identify the goods or the action Spalding hoped

consumers would take with them. A material issue of fact remains as to whether the use of "Swing Swing Swing" as related to the goods or action displayed in the final commercial was descriptive.

## B. *Good Faith*

### 1. *Good Faith Use of Protected Marks*

Fair use analysis also requires a finding that defendants used the protected mark in good faith. The good faith requirement has not been litigated frequently. *See* 2 McCarthy, *supra*, § 11:49 at 11–97. Courts and commentators who have considered the question equate a lack of good faith with the subsequent user's intent to trade on the good will of the trademark holder by creating confusion as to source or sponsorship. *See Institute for Scientific Info., Inc. v. Gordon & Breach, Science Publishers, Inc.*, 931 F.2d 1002, 1009–10 (3d Cir.1991); *Sierra On–Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1423 (9th Cir.1984); *Restatement (Third) of Unfair Competition* § 28 cmt. d; 3A Altman, *supra*, § 21:24 at 21–212; 2 McCarthy, *supra*, § 11:49 at 11–97.

In analyzing the proper scope of fair use good faith, precedents discussing good faith as the sixth *Polaroid* factor in the likelihood of confusion analysis are relevant because the focus of the inquiry is the same, namely, whether defendant in adopting its mark intended to capitalize on plaintiff's good will. *See Fun–Damental Too, Ltd. v. Gemmy Inds.*, 111 F.3d 993, 1005 (2d Cir.1997); *Sports Auth., Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 964 (2d Cir.1996). In *Fun–Damental Too* we considered the marks and the trade dress of two products, stating that "if there is additional evidence that supports the inference that the defendant sought to confuse consumers as to the source of the product, we think the inference of bad faith may fairly be drawn." 111 F.3d at 1005.

Any evidence that is probative of intent to trade on the protected mark would be relevant to the good faith inquiry. *See Sports Auth.*, 89 F.3d at 964. For example, were a flashlight manufacturer to develop a television commercial that flashed the phrase "Keep Shining!" interspersed with footage of a half-crazy, bearded Jack Nicholson look-alike pursuing his wife and child through a dark, abandoned hotel while shining a flashlight after them, the plot of the novel "The Shining" would assuredly be relevant to whether the manufacturer had used a patently descriptive term—"shining"—in good faith, not intending to trade on the good will and notoriety of the novel's title. Even this hypothetical would not be as close as the facts on this appeal, which involves two admittedly distinct, although similar, pieces of music.

When considering the likelihood of confusion and assessing the similarity of two marks, a court must take into account the overall context in which the marks appear and the totality of factors that could cause consumer confusion. *See Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 503–04 (2d Cir.1996); *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1078 (2d Cir.1993) ("courts look to the overall impression created by the [marks] and the context[s] in which they are found and consider the totality of factors that could cause confusion among prospective purchasers"); *Jean Patou, Inc. v. Jacqueline Cochran, Inc.*, 201 F.Supp. 861, 863 (S.D.N.Y.1962) ("[A] claim of unfair competition considers the total physical image given by the product and its name together."), *aff'd*, 312 F.2d 125 (2d Cir.1963); 3 McCarthy, *supra*, § 23:60 at 23–162 to 23–167; *cf.* 1 *id.* § 2.7 at 2–14 ("In unfair competition cases involving trade dress, every facet of the parties' selling program might be relevant—from the symbols, letters, pictures, colors, shapes and sizes connected with the products to the advertising representations made").

Because the good faith inquiry in a fair use analysis necessarily concerns the ques-

tion whether the user of a mark intended to create consumer confusion as to source or sponsorship, we think that the same contextual considerations apply to a court's analysis of good faith in the fair use defense to a claim under § 43(a). Thus, given the proper focus of the good faith inquiry, the district court erred in its analysis by failing adequately to consider whether the use of stock swing music in conjunction with the phrase "Swing Swing Swing" was probative of defendants' good (or bad) faith.

### 2. *Good Faith in Defendants' Use of "Swing Swing Swing"*

■ To the extent that it did analyze the issue, the trial court improperly made factual determinations about defendants' good faith. It relied on two precepts: first, prior knowledge of plaintiff's mark does not by itself constitute bad faith, *see Car–Freshner*, 70 F.3d at 270; *Lang v. Retirement Living Publ'g Co.*, 949 F.2d 576, 583–84 (2d Cir.1991); second, the display of defendant's own name or trademark in conjunction with the mark it allegedly infringes is evidence of good faith, *see Cosmetically Sealed*, 125 F.3d at 30; *Pirone v. MacMillan, Inc.*, 894 F.2d 579, 584 (2d Cir.1990). Based on these, the district court found no evidence of bad faith. We think this approach was error because rather than consider evidence tending to show defendants' bad faith, the trial court considered *only* those facts that supported a finding of defendants' good faith. In that way, it improperly tilted the balance in favor of a finding of good faith instead of determining whether a material issue of fact existed.

■ An inference of a lack of good faith may arise from a defendant's use of a plaintiff's mark with the intent to trade upon the good will represented by that mark. *See Institute for Scientific Info.*, 931 F.2d at 1010; *Sierra On–Line*, 739 F.2d at 1423; 2 McCarthy, *supra*, § 11:49 at 11–97. EMI presented evidence that, as originally conceived and developed in

the mockup, the commercial *was* intended to trade on the good will in the song and its title, because defendants contemplated paying for the right to do just that. After Spalding determined the cost to license the song was too high, Hill Holliday substituted different music but retained the alliterative phrase. In locating substitute music, Hill Holliday requested its sound studio find a "Benny Goodman-type song like 'Swing Swing Swing.'" The availability of other descriptive terms and a decision not to use one of those terms is also evidence suggesting bad faith. *See Sierra On–Line*, 739 F.2d at 1423; *Restatement (Third) of Unfair Competition* § 28 cmt. d; 3A Altman, *supra*, § 21:24 at 21–212. Hence, defendants' choice to keep the alliterative phrase "Swing Swing Swing" when "Swing" or "Stroke" or "Hit It!" were available is also evidence tending to show intent to trade on EMI's good will in the title "Sing, Sing, Sing."

Concededly, defendants' display of its own logo in the TV ad is evidence, as the district court believed, of defendants' good faith. But drawing the inferences from all the facts most favorable to EMI, and taking in the best light EMI's argument that the stock swing music adopted would sound similar to the Benny Goodman song in an ordinary consumer's ear, there are sufficient facts upon which a reasonable jury could conclude that defendants intended, in bad faith, to trade on EMI's good will in the title of the song by using the phrase "Swing Swing Swing" in the final commercial.

We cannot say on a motion for summary judgment that the two pieces of music are so dissimilar, or the commercial so evidently developed in good faith, that no material issue of fact exists. Despite the limited discovery that has so far occurred, there is evidence in the record pointing to defendants' both good and bad faith. This evidence should have been considered in the best light to non-movant EMI, and may, properly weighed, have prevented summary judgment in favor of defendants

on their fair use defense. Because the issue goes to defendants' intent, it "is best left in the hands of the trier of fact." *Sports Auth.*, 89 F.3d at 964; *see Lang*, 949 F.2d at 583 ("[i]ssues of good faith are generally ill-suited for disposition on summary judgment").

### III  Defendants' First Amendment Claim

Defendants renew on appeal their argument that the use of EMI's mark is protected by the First Amendment. They insist that their use of the phrase "Swing Swing Swing" in the final commercial is entitled to First Amendment protection from suit under the Lanham Act because it incorporates artistic expression and serves to disseminate information.

However, at this point in the proceedings, it is premature to decide the applicability of the First Amendment to the claim before us. The factual record is very limited and we have before us only the parties' arguments in their appellate briefs. There is no evidence in the record going to either the probability of confusion or the public interest in free expression. The district court declined to address defendants' First Amendment argument because it held that the fair use defense was dispositive. In light of our remand for further proceedings, we deem this question best answered in the first instance in the district court after further development of the factual record.

### CONCLUSION

Because the district court improperly analyzed the good faith requirement of fair use and erred in finding no material issue of fact as to defendants' descriptive use of EMI's mark in the title of the song, we reverse its grant of summary judgment and remand the case to it for further proceedings not inconsistent with this opinion.