06-2184-cv
American Express Co. v. Goetz

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2006

(Argued March 2, 2007            Decided February 4, 2008)

Docket No. 06-2184-cv

_____

American Express Co.,

Plaintiff-Counter-Defendant-Appellee,

v.

Stephen G. Goetz and Gardner Design Group, LLC,

Defendants-Counter-Plaintiffs-Appellants.

_____

Before:
                JACOBS, Chief Judge,
        CARDAMONE, and POOLER, Circuit Judges.

_____

        Defendants Stephen Goetz and Gardner Design Group, LLC appeal from a judgment entered February 24, 2006 in the United States District Court for the Southern District of New York (Kaplan, J.) granting plaintiff American Express's motion for summary judgment and dismissing Goetz's counterclaims. Goetz had alleged that American Express infringed upon his trademark by using the slogan MY LIFE. MY CARD.

        Affirmed.

_____

_____

KEITH A. VOGT, Chicago, Illinois (Rolf O. Stadheim, Joseph A. Grear, George C. Summerfield, Stadheim & Grear, Ltd., Chicago, Illinois; Micah R. Jacobs, Jacobs & Ferraro, LLP, San Francisco, California, of counsel), for Defendants-Appellants.

MARC J. RACHMAN, New York, New York (Howard J. Rubin, Shirin Keen, Davis & Gilbert, LLP, New York, New York, of counsel), for Plaintiff-Appellee.

_____

PER CURIAM:

Many might associate the phrase MY LIFE. MY CARD. with advertisements for the American Express credit card featuring celebrity cardholders like Robert De Niro and Tiger Woods. But before American Express Co. (American Express) made the phrase famous, Stephen Goetz, the president of Gardner Design Group, LLC (Goetz), used a virtually identical slogan in a sales pitch to credit card companies. Goetz's idea was to personalize credit cards by reproducing photographs selected by cardholders on the face of their cards. In search of clients, Goetz sent proposals to various credit card companies, including American Express, containing a description of his concept and the catchphrase My Life, My Card.

In response to American Express's MY LIFE. MY CARD. campaign, Goetz demanded the company cease and desist using the slogan. American Express responded by commencing the instant declaratory judgment action in the United States District Court for the Southern District of New York before Judge Lewis A. Kaplan seeking a declaration that it had not misappropriated the slogan and that Goetz lacked a viable claim for infringement. In a judgment entered on February 24, 2006 the district judge granted summary judgment to American Express and dismissed Goetz's counterclaims for misappropriation and trademark infringement.

Goetz's principal challenge on appeal is to the district court's ruling that he had not used the slogan as a trademark. We affirm.

BACKGROUND

In the summer of 2004 Goetz, who was then working as a corporate consultant for a company called Mez Design, formulated an idea to enable credit card customers to personalize a card by choosing a photograph to be printed on the card's face. Goetz developed proprietary software with this capability and endeavored to license or sell the software to credit card companies. In proposing his idea to potential clients, Goetz prominently displayed the slogan he created -- "My Life, My Card" -- believing that the phrase "would perfectly embody what card consumers sought."

On July 30, 2004 Goetz mailed a proposal to American Express with a line reading: "'My Life, My Card' American Express delivers personalized cards to its cardholders!" Goetz sent similar proposals to Mastercard, Citigroup, Kessler Financial Services, and Metavante, in each case tailoring the catchphrase to the prospective client. With the help of Hans Krebs, an expert in web design, Goetz also created an Internet-based demonstration of his card personalization concept, which prominently displayed the slogan My Life, My Card on Krebs' server at http://mylifemycard.hanskrebs.com. On September 7, 2004 Goetz registered the domain name www.mylife-mycard.com and the following day he filed an application with the United States

Patent and Trademark Office for registration of the My Life, My Card mark.

American Express never replied to Goetz's proposal, but MasterCard expressed interest. In December 2004 and February 2005 Goetz met with MasterCard to discuss his personalized credit card services and, in his correspondence with Mastercard representatives, Goetz suggested they view his demonstration on the Internet.

Also in the summer of 2004 American Express hired the Ogilvy Group advertising agency (Ogilvy) to assist in the development of a new global campaign for American Express products. On July 22, 2004 Ogilvy proposed the MY LIFE. MY CARD. idea as the lynchpin of American Express's new campaign. American Express responded favorably and, between July 26 and July 28, Ogilvy developed several advertisements centering on the slogan. On July 29 Ogilvy's outside counsel conducted a preliminary trademark search to determine the availability of the slogan as a service mark in the United States. Ogilvy next asked its counsel to follow-up with a full trademark search on July 31, which was two days prior to the scheduled delivery date of Goetz's proposal to American Express. Neither trademark search produced any references to Goetz.

After deciding in August 2004 to proceed with the slogan and the campaign, American Express registered the domain name www.mylifemycard.com on September 1, 2004 and filed an Intent to Use application for MY LIFE. MY CARD. with the United States

Patent and Trademark Office on September 15, 2004. Ultimately, in early November 2004 American Express launched the global campaign by means of television, print, outdoor, and Internet advertising. The present litigation followed.

During discovery, Goetz sought to examine in their entirety numerous computer hard drives belonging to Ogilvy and American Express employees. When American Express refused this request, Goetz moved to compel production. On October 27, 2005 Judge Kaplan granted Goetz's motion only to the extent it involved electronic records pertinent to the disputed dates of creation of two documents. The district court also granted American Express's motion to stay further discovery pending the court's disposition of its summary judgment motion.

In a judgment entered on February 24, 2006 the court granted summary judgment to American Express and dismissed Goetz's counterclaims. The court held that Goetz had "no valid protectable trademark rights in My Life, My Card or any other purported mark using those words that are senior to [American Express's] rights in MY LIFE. MY CARD." The district court also observed that Goetz did not contest that American Express independently conceived of the slogan. Following entry of judgment, Goetz filed a timely appeal of the trademark ruling as well as its October 27, 2005 order denying his more far-reaching discovery motion.

5

DISCUSSION

I  Standard of Review

We review the district court's grant of summary judgment <u>de</u> <u>novo</u>, construing the facts in the light most favorable to Goetz. <u>See</u> <u>Tocker v. Philip Morris Cos.</u>, 470 F.3d 481, 486 (2d Cir. 2006).  Discovery rulings are reviewed under an abuse of discretion standard.  <u>Gualandi v. Adams</u>, 385 F.3d 236, 244-45 (2d Cir. 2004).

II  Goetz Did Not Use the Slogan As a Trademark

Under the Lanham Act, 15 U.S.C. §§ 1051 <u>et</u> <u>seq.</u>, a trademark or service mark is any combination of words, names, symbols or devices that are used to identify and distinguish goods or services and to indicate their source.  <u>See</u> 15 U.S.C. § 1127. While copyright law protects the content of a creative work itself, <u>see</u> <u>EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc.</u>, 228 F.3d 56, 63 (2d Cir. 2000), it is trademark law that protects those symbols, elements or devices which identify the work in the marketplace and prevent confusion as to its source.  <u>See</u> <u>id.</u> at 62-63; <u>see</u> <u>also</u> 1 J. Thomas McCarthy, <u>McCarthy on Trademarks and Unfair Competition</u> § 6:17.50, at 6-38 (4th ed. 2000) (noting that trademark law does not serve as a substitute for copyright).  For example, the title of a song might identify that song in the marketplace, but the musical composition itself would not perform that function; thus, while the title may be protectable by trademark, the composition would not be.  <u>EMI Catalogue P'ship</u>, 228 F.3d at 63.  Further, a mark

6

that does not perform the role of identifying a source is not a trademark. See id. at 64.

Notably, the same mark that performs this source-identifying role in one set of hands may constitute the creative work itself in another. Such distinction often is appropriate when an advertising agency licenses a slogan to a client for the client's use in marketing a product. In this scenario, the slogan is part of the advertising agency's creative work, but it may become a source identifier when used by the client. See 2 McCarthy, supra, § 16.39, at 16-64.2 ("In many situations . . . the mere conception of a mark by an advertising agency for possible use by the client does not create any trademark rights in the agency.").

The Patent and Trademark Office's Trademark Trial and Appeal Board has long recognized, in such situations, that the slogans cannot be registered as marks by the advertising agency, even if they would be subject to registration by the end users of the marks. See In re Admark, Inc., 214 U.S.P.Q. 302, 303 (T.T.A.B. 1982). The reason is plain: the slogan does not identify and distinguish the services of the advertising agency, but rather is the creative work itself. Id.; see also In re Adver. & Mktg. Dev., Inc., 821 F.2d 614, 620 (Fed. Cir. 1987) (explaining that an advertising agency cannot register a mark it uses to identify the subject of the advertising as opposed to the agency's services); In re Local Trademarks, Inc., 220 U.S.P.Q. 728, 730 (T.T.A.B. 1983) ("We believe that applicant's insurance agency clients would view the slogan 'WHEN IT'S TIME TO ACT[]' . . . as

7

a feature of applicant's product and not as a mark identifying and distinguishing the service being rendered by applicant.").

In the present case, construing all the facts in Goetz's favor, the only reasonable conclusion that can be drawn is that My Life, My Card was a component of Goetz's business proposal to the credit card companies rather than a mark designating the origin of any goods or services he offered to them.

According to Goetz, he believed that the phrase My Life, My Card would "perfectly embody what card consumers sought." Yet, for the obvious reason that Goetz did not sell credit cards, he never displayed the slogan to card consumers. Instead, he offered the slogan as a complement to the card personalization concept and software he proposed to sell and, in this respect, his claim is no better than that of an advertising agency that offers its clients a marketing concept to enhance their sales.

Our review of Goetz's letters and proposals to card companies reinforces that conclusion. Every use of the tagline My Life, My Card is immediately followed by the name of a credit card company which might choose to deliver personalized cards with such a slogan. My Life, My Card never appears as a stand-alone logo and the phrase is never followed by a reference to Goetz himself or his company. It is thus clear that Goetz did not intend the phrase My Life, My Card to ensure MasterCard, American Express or Citigroup would associate the card personalization concept with him, but instead to interest these companies in a slogan that would identify personalized cards with

8

whichever company elected to make this product available to its customers.

A comparison of Goetz's use of the Mez Design logo with his use of the My Life, My Card slogan in his correspondence with prospective clients further illustrates our point. The Mez Design logo appeared in the upper left hand corner of both the proposal itself and Goetz's cover letters to the companies. Such placement indicated to readers that Mez Design was the source of Goetz's proposal. Similarly, in his letters Goetz emphasized that "[w]ith over 10 years of marketing and design expertise, Mez Design is in a unique position to deliver competitive solutions," "Mez Design has helped its partners increase brand awareness and gain market share," and "Mez Design has done the research, and will invest the capital to deliver your product." We recognize that a company's marks need not be derived from its trade name, and many companies use multiple marks, but Goetz's references to Mez Design furnish a solid example of typical trademark usage: Goetz plainly desired readers to associate his goods or services with the Mez Design mark. My Life, My Card, by contrast, appeared in the section of Goetz's correspondence in which he described the content of his proposal.

In sum, Goetz employed the slogan My Life, My Card to generate interest among potential licensee credit card companies and not to differentiate or identify the origin of his goods or services. In such circumstances, the slogan served as "a mere advertisement for itself as a hypothetical commodity."

9

Silberstein v. Fox Entm't Group, Inc., 424 F. Supp. 2d 616, 633 (S.D.N.Y. 2004). Consequently, Goetz's trademark claim was properly dismissed.

### III  Analogous Use

It is firmly established that "the right to exclusive use of a trademark derives from its appropriation and subsequent use in the marketplace." La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc., 495 F.2d 1265, 1271 (2d Cir. 1974) (Friendly, J.). Thus, there can be no trademark absent goods sold and no service mark without services rendered. See, e.g., Chance v. Pac-Tel Teletrac Inc., 242 F.3d 1151, 1156 (9th Cir. 2001) ("[L]ike with trademarks, common law rights are acquired in a service mark by adopting and using the mark in connection with services rendered." (emphasis added)). Unlike trademarks, service marks usually cannot be "affixed" or displayed in close connection with the services, so advertisements and solicitations are often used as evidence of use. See generally 4A Rudolf Callmann, The Law of Unfair Competition, Trademarks and Monopolies § 26:27, at 26-225 to 26-228 (Louis Altman 4th ed. 1998). However, it cannot be said that a service mark is actually used if it is displayed in an advertisement for services that are non-existent or will only hypothetically be available at some point in the future. See, e.g., Greyhound Corp. v. Armour Life Ins. Co., 214 U.S.P.Q. 473, 474-75 (T.T.A.B. 1982). Goetz made no actual use of My Life, My Card since Goetz's services

10

were wholly hypothetical when he sent his promotional materials to the credit card companies.

Goetz counters that even if he did not actually use My Life, My Card as a trademark, his activities were analogous to trademark use. Goetz cites Diarama Trading Co. v. J. Walter Thompson U.S.A., Inc., No. 01 Civ. 2950, 2005 WL 2148925 (S.D.N.Y. Sept. 6, 2005) and Housing & Services, Inc. v. Minton, No. 97 Civ. 2725, 1997 WL 349949 (S.D.N.Y. June 24, 1997), in support of the assertion that analogous use is sufficient to establish trademark rights in the absence of actual use. These cases suggest that the analogous use doctrine, where it applies, eases the technical requirements for trademarks and services marks in favor of a competing claimant who asserts priority on the basis of earlier analogous use of the mark. Diarama, 2005 WL 2148925, at *7 ("[P]rior 'use of a designation . . . in a manner analogous to trademark and service mark use' can defeat a trademark registered by a subsequent user."); Minton, 1997 WL 349949, at *3 (noting that evidence of an actual sale may not be required to establish prior use).

Goetz's use of the My Life, My Card logo does not qualify as analogous use. At the very least analogous use must be use that is "open and notorious." See Minton, 1997 WL 349949, at *4. In other words, analogous use must be "of such a nature and extent" that the mark has become "popularized in the public mind" so that the relevant segment of the public identifies the marked goods with the mark's adopter. Id.; see Diarama, 2005 WL 2148925, at

11

*7. Here, Goetz used his slogan only in communications with a few commercial actors within the credit card industry. There was no public exposure of the My Life, My Card slogan. In fact, Goetz himself, in a series of emails to Hans Krebs between August and October 2004, indicated that he wanted to keep a low profile for the project and for the website. Such use was neither open nor notorious and My Life, My Card never came to be associated with Goetz in the public mind.

Moreover, as Goetz never made actual use of the slogan, he would have us rely on his purported analogous use as the sole source of his trademark rights. The doctrine, however, has not been stretched so far as to obviate the requirement that Goetz show eventual actual use. See De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate Inc., 440 F. Supp. 2d 249, 265 n.14 (S.D.N.Y. 2006) ("[I]nsofar as plaintiffs contend that they can obtain protectable rights in a mark solely through [analogous use], this view of Section 43(a)'s scope has never been adopted by this circuit." (emphasis in original)); WarnerVision Entm't Inc. v. Empire of Carolina Inc., 915 F. Supp. 639, 646 (S.D.N.Y. 1996), vacated on other grounds 101 F.3d 259 (2d Cir. 1996) (any promotional activities "must be within a commercially reasonable time prior to actual use" for them to be considered analogous uses).

## IV  Discovery Ruling

Goetz unpersuasively claims that the district court abused its discretion by limiting discovery to ascertain whether

12

American Express independently conceived of MY LIFE. MY CARD. Specifically, Goetz appealed the district court's October 27, 2005 order denying him full access to computer hard drives of employees of American Express and Ogilvy who worked American Express's campaign.

The district court granted Goetz's motion to compel production in part and afforded him access to electronic records pertaining to documents the dates of creation of which were in question. Although Goetz's motion called for broader discovery than was granted him, Goetz has not identified any error in the district court's determination that "such wholesale rummaging" through American Express's electronic records was not appropriate here.

## CONCLUSION

For these reasons, the judgment of the district court granting American Express's motion for summary judgment and dismissing Goetz's counterclaims is affirmed.

13