[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-14040
_____

D.C. Docket No. 3:12–cv–00102–CAR


FN HERSTAL SA,

Plaintiff–Counter Defendant–Appellee,

versus

CLYDE ARMORY INC.,

Defendant–Counter Claimant–Appellant.

_____

Appeal from the United States District Court
for the Middle District of Georgia
_____

(September 27, 2016)

Before MARTIN and JORDAN, Circuit Judges, and COOGLER,[*] District Judge.

COOGLER, District Judge:

This trademark infringement action arises out of the parties' use of the marks "SCAR" and "SCAR-Stock" in the firearms industry. Appellant Clyde Armory Inc. ("Clyde Armory") appeals the district court's partial grant of summary judgment in favor of Appellee FN Herstal SA ("FN"), its grant of FN's motion to strike Clyde Armory's jury demand, its denial of Clyde Armory's motion to amend the proposed pretrial order, and its entry of judgment against Clyde Armory following a bench trial. After careful review of the record and briefs of the parties, and having the benefit of oral argument, we affirm the district court on all issues raised on appeal.

## I.    BACKGROUND

### A.    Facts[1]

#### 1.    FN's SCAR Mark

In January 2004, the United States Special Operations Command ("USSOCOM") issued a solicitation requesting bids from firearms manufacturers to design and manufacture a new fully automatic assault-rifle system for various

---

[*] The Honorable L. Scott Coogler, United States District Judge for the Northern District of Alabama, sitting by designation.

[1] These are the facts presented at trial and those upon which the district court made specific findings.

units of the United States military, including Navy SEALs, Army Rangers, and Green Berets. The solicitation and other documents referred to the rifle as the "Special Operations Forces Combat Assault Rifle," abbreviated with the acronym SCAR. However, the U.S. military did not use SCAR as a trademark or otherwise claim any rights in the name SCAR. The solicitation generated significant publicity and media coverage in the firearms community, as it was the first open competition for a new military rifle since the M16 trials held in the 1960s.

FN is a firearms and weapons manufacturer headquartered in Belgium. In 2004, FN and other firearm manufacturers, including Colt Defense LLC and Cobb Manufacturing, Inc., submitted prototypes in response to USSOCOM's solicitation. While not required to do so, FN chose to label its submission with the SCAR mark, placing the mark above the firearm's trigger. FN branded its rifles as such to draw on the double entendre from the military's use of the term and the everyday meaning of "scar" as a mark left by the healing of injured tissue. For instance, FN's brochures and other promotional materials drew on the ordinary meaning of "scar" through slogans like "BATTLE SCARS."

On November 5, 2004, FN won the competition, and USSOCOM awarded it a ten-year contract, placing a large initial order for SCAR firearms totaling over $634,000. From that point forward, FN regularly shipped SCAR-branded rifles to the U.S. military for use by special forces. By November 2007, FN had sold over

3

$11 million in SCAR rifles and accessories to the military pursuant to the USSOCOM contract.

The media, law enforcement, and civilian firearms consumers closely followed the USSOCOM competition and FN's development of the SCAR rifle. In the years 2004 to 2006, journalists regularly sought to examine FN's SCAR rifles, and at least one article per month covered FN's development and distribution of the SCAR rifle in publications such as *Small Arms Review*, *National Defense*, *Army Times*, and *Guns and Ammo*. As the district court found, an expectation exists in the firearms market that guns developed for the military will subsequently be offered to law enforcement and civilians. As a result, FN received many inquiries concerning when FN's SCAR rifles would be available for general consumption.

On February 22, 2005, FN began promoting its SCAR rifle to law enforcement and civilians, though it did not yet have a semi-automatic version of the weapon available for purchase by civilian consumers. Indeed, FN dedicated one-fourth of its advertising budget to promote the SCAR rifle to the firearms market. Throughout 2005 and 2006, FN showcased its military SCAR rifle at hundreds of trade shows, including one of the largest firearms shows in the world, the Shooting, Hunting, and Outdoor Trade Show ("SHOT Show"), as well as National Rifle Association shows, the National Defense Industrial Association

4

Small Arms forum, the Association of the United States Army show, International Chiefs of Police shows, the National Sheriff Show, the Mock Prison Riot, the SWAT Round Up, the Police and Security Expo, and others. At these shows, FN routinely told attendees that it intended to introduce a semi-automatic version within two years. FN also distributed hats, T-shirts, key chains, brochures, flyers, and other promotional materials with the SCAR mark. Public interest in the rifle was high; for example, at the February 2006 SHOT Show held in Las Vegas, Nevada, hundreds of people lined up at FN's booth to see FN's SCAR rifle, and FN had to dedicate three employees to answering attendees' nonstop questions about its weapon. According to Bucky Mills, the Senior Director of Law Enforcement Sales and Training at FN, FN's SCAR rifle was "big news" and was "the number one talked about firearm at the whole SHOT Show in 2006." The fact that ninety percent of SHOT Show attendees are not affiliated with the U.S. military but are instead comprised of law enforcement personnel, distributors and retailers of firearms, and civilian consumers, speaks to the excitement among civilians about the prospect that FN would be introducing a semi-automatic SCAR rifle. In March 2006, FN issued a press release entitled, "The Making of the 21st Century Assault Rifle: SCAR SOF Combat Assault Rifle," which detailed the ongoing development of its SCAR rifle for USSOCOM. The press release also

announced that the semi-automatic version of the SCAR "[would] potentially be available in the next two years."

FN was not able to release the civilian version of the SCAR rifle until November 2008 because, according to the testimony of Frank Spaniel ("Spaniel"), the Assistant Vice President of Research and Development at FN, it took several years to test the prototypes in various environments, make modifications that would prevent a civilian from converting it into a fully automatic weapon, and ensure that its factories could produce increasing quantities of the weapons while maintaining quality. FN also had to seek government approval from the Bureau of Alcohol, Tobacco, Firearms and Explosives (the "ATF") to sell the semi-automatic SCAR to the wider commercial market, which took months. Finally, FN was contractually obligated to fill military orders before satisfying civilian demand for the weapon. However, the pent-up demand from 2004 to 2008 resulted in FN selling over $100 million worth of SCAR firearms after receiving ATF approval.

To enforce its rights in the SCAR mark, FN filed three trademark applications with the United States Patent and Trademark Office ("USPTO"). The first was for the use of SCAR on firearms and related items, which at the point of the district court proceedings was still pending before the USPTO. The second was for SCAR (and Design) for use in connection with firearms and related items, which indicated a date of first use of November 1, 2008. The USPTO registered

the SCAR and Design mark in June 2010. The third was for SCAR for use in connection with games, toy replicas of weapons, and other related items, which was registered by the USPTO in February 2012.

### 2.    Clyde Armory's SCAR-Stock Mark

Clyde Armory is a firearms retailer located in Georgia owned by Andrew Clyde ("Clyde"). Clyde has been in the firearms business since 1991. He has long been familiar with FN, having sold FN products since 2002. He was also an FN distributor from approximately 2006 to 2011.

In 2005, Clyde contacted Sage International, Ltd. ("Sage") President John Klein ("Klein") about manufacturing a replacement stock for certain rifles made by Sturm Ruger & Co., including the Mini-14, Mini-30, and AC-556. At the February 2006 SHOT Show, the same show in which long lines of attendees waited to see FN's SCAR rifle, the two met and planned the specific configuration for this replacement stock.

In April 2006, Clyde Armory selected the name SCAR-Stock or SCAR-CQB-Stock in connection with its replacement stocks. Clyde Armory claims that its use of the term SCAR is an acronym for "Sage Clyde Armory Rifle" stock. However, Klein had no recollection of this. At the time Clyde Armory adopted the SCAR-Stock mark, Clyde knew about the USSOCOM solicitation to create a combat rifle system. Clyde further knew that the rifle was abbreviated as the

7

SCAR, and that USSOCOM had awarded FN the development contract to produce it, as he had seen an article in *Small Arms Review* announcing that FN won the bid to create the SCAR for USSOCOM.

Joshua Smith ("Smith"), Clyde Armory's former Chief Operations Officer, testified that FN's SCAR rifle was well known in the firearms world. He stated that when Clyde disclosed his plan to use SCAR-Stock in association with its stocks, Smith expressed concern that the SCAR "name was already taken . . . [b]y FN." Smith testified that Clyde Armory's intent was to "take advantage of marketing of the SCAR being a popular name already" and to "take advantage of the SCAR product name being on the market." Although Clyde testified that such a discussion never occurred, and although Smith left Clyde Armory in 2009 under bad circumstances, the district court found Smith's testimony credible in light of Clyde's admitted knowledge about FN's SCAR rifles.

Throughout the spring and summer of 2006, Clyde Armory worked with Sage to finalize its replacement stock system, and it shipped its first SCAR-Stock product to a consumer on September 18, 2006. The stocks were engraved with the mark SCAR-CQB-Stock in the same font, color, and size as the SCAR mark on FN's rifles, using a laser just as FN used. Clyde Armory began promoting SCAR-Stock stocks through its website www.clydearmory.com, online advertising, print ads, and trade show displays. In early 2007, it began using the domain name

www.scarstock.com, which channels Internet traffic to www.clydearmory.com.
Through April 2015, Clyde Armory had sold 913 SCAR-Stock units, for a total
gross revenue of approximately $450,000.

### B.    Procedural History

FN sent Clyde Armory a letter in February 2009, asserting senior rights in
the SCAR mark and demanding that Clyde Armory cease and desist all use of its
SCAR-Stock mark. Clyde Armory responded that it had no knowledge of FN's
rights in the mark and requested documentation to support that claim. The
following day Clyde Armory filed a trademark application for the SCAR mark
with the USPTO for use on "gun stocks" and claiming a first date in commerce on
September 14, 2006. Clyde Armory received a reply from FN stating that "the
acronym SCAR in U.S. Government jargon does refer to the USSOCOM
Program." The letter went on to state, "[h]owever, in Commercial firearms use of
the term SCAR has been registered by [FN] as a Trademark." Clyde Armory then
filed a Petition for Cancellation with the USPTO of FN's trademark registration of
SCAR (and Design) and an Opposition to FN's trademark application for SCAR.
The USPTO suspended those proceedings pending the outcome of this case.

In March 2012, FN filed an eight-count complaint against Clyde Armory for
trademark infringement, unfair competition, and dilution in violation of the
Lanham Act, 15 U.S.C. § 1051, *et seq*., as well as state law claims for unfair

competition, deceptive trade practices, and unjust enrichment. FN demanded damages and Clyde Armory's profits under § 1117(a) of the Lanham Act, as well as punitive damages and litigation expenses including attorney's fees. FN also sought to enjoin Clyde Armory from any further use of the SCAR-Stock mark and sought an order requiring Clyde Armory to abandon its pending trademark application for the SCAR-Stock mark and dismiss its opposition and cancellation petitions with regard to FN's trademark registrations and applications. Clyde Armory asserted affirmative defenses based on priority of its use of the SCAR-Stock mark and FN's unlawful use of the SCAR mark. Clyde Armory also asserted counterclaims for federal trademark infringement and requested declaratory relief in the form of cancellation of FN's trademark registrations. Clyde Armory sought similar damages and injunctive relief. Both parties demanded a trial by jury.

Both parties submitted motions for summary judgment, in which they agreed that the success of all claims and counterclaims depended on the viability of each party's federal trademark infringement claims. Both parties asserted that their mark is distinctive and that they were the first to use it in commerce. The district court denied both motions, finding that genuine disputes of material fact existed regarding which party held priority of rights in its respective mark. However, with respect to Clyde Armory's unlawful-use defense, the district court ruled that Clyde Armory could not proceed with it at trial, as the Eleventh Circuit had not adopted

10

the defense, the undisputed facts showed that FN did not engage in a *per se* violation of the regulations at issue, and even if a violation occurred, it was immaterial.

In preparing for trial, the parties jointly submitted a proposed pretrial order. Although the proposed pretrial order referenced a jury trial, it also stated: "Neither party is seeking damages and the parties further agree that whichever party establishes its priority of rights will request to be entitled to the trademark registration(s) it has sought . . . and seek a permanent injunction against the other party." During the pretrial conference, Clyde Armory represented to the district court that it sought only injunctive relief, confirming that it was not pursuing damages, and agreed with the Court that a jury need not decide the case.[2] One week after that pretrial conference, FN filed a motion to strike the parties' jury demands, contending that all remaining claims were equitable and thus no right to a trial by jury existed. Clyde Armory opposed that motion and argued that FN had consented to a jury trial by both explicitly referencing the use of a jury in the proposed pretrial order and by failing to object to a trial by jury during the pretrial

---

[2] The following exchange occurred:

THE COURT:        Obviously the request here is for injunctive relief. . . . I mean, I see this as a matter of law as opposed to something the jury needs to do.

MR. BELLAMY:      That is the Defendant's position.

11

conference. The district court granted FN's motion to strike, noting that when no right to a jury trial exists, a party may unilaterally withdraw its consent to a jury trial. The court further noted that Clyde Armory would suffer no prejudice because the parties still had ten days before the trial was scheduled to begin, and a bench trial would likely require less preparation than a jury trial.

After the district court issued its order striking the jury demands, Clyde Armory filed a motion to amend the proposed pretrial order so that it could reinstate its demand for FN's profits under § 1117(a) of the Lanham Act, which it argued constituted legal relief entitling it to a jury trial. The district court denied the motion, ruling that Clyde Armory waived its right to seek profits through its repeated representations to the court that it would not seek them. In denying that motion, the district court also found that FN would be prejudiced if Clyde Armory reinstated its claim for profits a week before trial because FN had been given no opportunity to conduct discovery on that claim. The district court also noted that it was unsure if Clyde Armory's proposed amendment would even revive Clyde Armory's right to a jury trial, noting a split of authority on the issue.

The litigation thus proceeded to a three-day bench trial, in which six witnesses testified, including three FN employees, a Clyde Armory employee, Clyde Armory's former Chief Operating Officer Smith, and its owner, Clyde. The district court issued an order on August 20, 2015, in which it found that FN

developed protectable trademark rights in the SCAR mark before Clyde Armory began using the SCAR-Stock mark in September 2006; Clyde Armory intentionally copied FN's SCAR mark in bad faith; and FN thus prevailed on its federal trademark infringement and unfair competition claims and related state law claims. The court ordered Clyde Armory to cease using the SCAR-Stock mark, abandon its trademark applications, assign domain names including the word SCAR to FN, dismiss its petition to cancel FN's federal trademark registrations for SCAR, and destroy materials featuring the SCAR-Stock mark.

Clyde Armory timely appealed the district court's partial summary judgment order, the order granting FN's motion to strike the jury demand, the order denying Clyde Armory's motion to amend the proposed pretrial order, and the order granting judgment as to all claims in favor of FN. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## II.    DISCUSSION

### A.    Standards of Review

 "After a bench trial, we review the district court's conclusions of law *de novo* and the district court's factual findings for clear error." *Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1230 (11th Cir. 2009). In an action tried without a jury, "[f]indings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the

trial court's opportunity to judge the witnesses' credibility." Fed. R. Civ. P. 52(a)(6).The district court's summary judgment ruling on Clyde Armory's unlawful-use defense is subject to *de novo* review. *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1193 (11th Cir. 2001). The district court's grant of a motion to strike a jury demand is reviewed in "plenary fashion," or *de novo*. *Stewart v. KHD Deutz of Am. Corp.*, 75 F.3d 1522, 1525 (11th Cir. 1996). The district court's decision on a motion to amend the pretrial order is reviewed for an abuse of discretion. *Morro v. City of Birmingham*, 117 F.3d 508, 513, 515–16 (11th Cir. 1997). Reversal under this standard is proper only when the court "so clearly abused its discretion that its action could be deemed arbitrary." *Id.* at 513 (quoting *Hodges v. United States*, 597 F.2d 1014, 1018 (5th Cir. 1979)).

## B.    The District Court's Judgment in Favor of FN Following Trial

Clyde Armory contends that the district court committed three errors[3] in its post-trial order: (1) finding that FN used SCAR as a mark in commerce before Clyde Armory began using SCAR-Stock; (2) finding that FN's SCAR mark acquired distinctiveness through secondary meaning before Clyde Armory began using SCAR-Stock; and (3) finding that Clyde Armory used the SCAR-Stock mark

---

[3] Clyde Armory describes each of these as errors of law entitling them to be reviewed *de novo*, but for the reasons discussed herein, we find that Clyde Armory is actually challenging the district court's factual determinations underlying these legal conclusions.

in bad faith to take advantage of the popularity of FN's SCAR mark, thus divesting it of any rights in the mark that it otherwise might have obtained.

A trademark is "any word, name, symbol, or device, or any combination thereof [used] to identify and distinguish [a producer's] goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C. § 1127. To prevail on a trademark infringement claim under the Lanham Act, a party must prove that (1) it owns a valid and protectable mark, and (2) the opposing party's use of an identical or similar mark is likely to cause confusion. *Gift of Learning Found., Inc. v. TGC, Inc.*, No. 01–08069–CV–DTKH, 2001 WL 34718642, 2001 U.S. Dist. LEXIS 25301 (S.D. Fla. 2001), *aff'd*, 329 F.3d 792, 797 (11th Cir. 2003) (per curiam). The parties agreed before trial that simultaneous use of their marks would likely confuse the purchasing public. Therefore, the only issue before the district court was whether either party owned a protectable mark. In general, "[a]ctual substantive rights to a trademark arise based on its use in commerce and its distinctiveness." *Knights Armament Co. v. Optical Sys. Tech., Inc.*, 654 F.3d 1179, 1188 (11th Cir. 2011).

### 1. The District Court's Finding that FN Used the SCAR Mark in Commerce before Clyde Armory Used the SCAR-Stock Mark

A trademark on goods is used in commerce when "it is placed in any manner on the goods or their containers or the displays associated therewith [and] the goods are sold or transported in commerce." 15 U.S.C. § 1127. "Rights in a trademark are determined by the date of the mark's first use in commerce. The party who first uses a mark in commerce is said to have priority over other users." *Hana Fin., Inc. v. Hana Bank*, 135 S. Ct. 907, 909 (2015). We review the district court's factual findings underlying its priority determination for clear error. *See Sheila's Shine Prods., Inc. v. Sheila Shine, Inc.*, 486 F.2d 114, 122 (5th Cir. 1973) (reviewing for clear error the district court's factual determination that the plaintiff's business selling metal and wood polish was sufficiently established so as to create the first use in commerce of the mark associated with it, "Sheila's Shine"); *see also Martahus v. Video Duplication Servs., Inc.*, 3 F.3d 417, 421 (Fed. Cir. 1993) ("We review any factual findings underlying a priority determination for clear error.").

This Court uses a two-part test to determine whether a party has demonstrated prior use of a mark in commerce:

> [E]vidence showing, first, adoption, and, second, use in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the

16

mark, is competent to establish ownership, even without evidence of actual sales.

*Planetary Motion*, 261 F.3d at 1195 (quoting *New Eng. Duplicating Co. v. Mendes*, 190 F.2d 415, 418 (1st Cir. 1951)) (footnotes omitted). The typical evidence of use in commerce is the sale of goods bearing the mark. *See id.* at 1194–95; 15 U.S.C. § 1127. However, in the absence of actual sales, advertising, publicity, and solicitation can sufficiently meet the public identification prong of the test. *See Planetary Motion*, 261 F.3d at 1195–96. The district court and the parties use the term "analogous use" to describe these promotional efforts, which is derived from other courts' analysis of this issue. *See, e.g.*, *Am. Express Co. v. Goetz*, 515 F.3d 156, 161 (2d Cir. 2008) ("[T]he analogous use doctrine, where it applies, eases the technical requirements for trademarks and services marks in favor of a competing claimant who asserts priority on the basis of earlier analogous use of the mark."); *T.A.B. Sys. v. Pactel Teletrac*, 77 F.3d 1372, 1375 (Fed. Cir. 1996) (analogous use refers to pre-sale promotional efforts such as "advertising brochures, catalogs, newspaper ads, and articles in newspapers and trade publications"). However, "activities claimed to constitute analogous use must have substantial impact on the purchasing public." *T.A.B. Sys.*, 77 F.3d at 1376. "At the very least analogous use must be use that is open and notorious [or] of such a nature and extent that the mark has become popularized in the public mind so that the relevant segment of the public identifies the marked goods with the mark's adopter." *Goetz*, 515 F.3d at

17

161–62 (internal quotation marks and citations omitted). The promotional activities must also occur within a commercially reasonable period of time prior to actual use of the mark to be considered analogous use of the mark. *See id*. at 162.

Considerable evidence supports the district court's factual finding that FN used the SCAR mark in commerce prior to Clyde Armory's first sale of a replacement stock bearing the SCAR-Stock mark September 2006. On November 5, 2004, USSOCOM entered into a ten-year contract with FN and ordered SCAR brand rifles in an amount totaling over $634,000. Thereafter, FN continuously sold and transported firearms bearing its SCAR mark from Belgium to USSOCOM in the United States for use by military special forces. By November 5, 2007, FN had sold over $11 million worth of SCAR firearms and accessories to the military pursuant to the USSOCOM contract. All the while, FN received extensive media attention, which credited FN with winning the USSOCOM bid and tracked the development of FN's SCAR weapon system for the military. Clyde Armory asserts that FN's sales solely to one governmental entity should not constitute "use in commerce," but these facts support the district court's conclusion that FN's sales to the military were nonetheless "sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of [FN,] the adopter of the mark." *Planetary Motion*, 261 F.3d at 1195.

Nor does the fact that FN did not have a semi-automatic SCAR weapon available for law enforcement and civilian purchase until late 2008 change our analysis because, in addition to military sales, FN established prior use through analogous use: that is, extensive pre-sale advertising and promotional activities for its semi-automatic SCAR rifle dating back to 2005. Almost immediately after it began shipping and selling to USSOCOM, FN started marketing SCAR brand rifles to law enforcement and civilians, dedicating one-fourth of its advertising budget to showcase its SCAR rifles at hundreds of trade shows and events in 2005 and 2006, including the February 2006 SHOT Show where its SCAR rifle was "the number one talked about firearm," further promoting the SCAR rifles with accompanying hats, T-shirts, keychains, brochures, and other promotional materials all bearing the SCAR mark, and issuing a press release in March 2006 detailing its intent to develop the semi-automatic version within two years. Although actual sales were not made until late 2008, these "open and notorious" promotional activities in 2005 and 2006 sufficiently created an association in the relevant portion of the public's mind so that they identified the SCAR rifles with FN. *See Goetz*, 515 F.3d at 161–62; *Planetary Motion*, 261 F.3d at 1195–96.

We also note that although Clyde Armory states that it is relevant that FN listed a first use date of November 1, 2008, on one of its trademark applications, its USPTO applications and registrations are not relevant to the foregoing analysis.

19

Neither federal nor Georgia law requires that a party assert a trademark registration before bringing Lanham Act or state law claims. *See* 15 U.S.C. § 1125(a); Ga. Code Ann. §§ 23–2–55, 10–1–373; *Bauer Lamp Co. v. Shaffer*, 941 F.2d 1165, 1171 (11th Cir. 1991) ("Trademark protection accrues with use, while copyright protection begins with registration."). FN thus appropriately relied on its common law rights in the SCAR mark derived through actual use dating back to 2004. Nor is Clyde Armory's suggestion well-taken that because USSOCOM invented the term SCAR, FN could not develop trademark rights. A leading treatise on trademarks states, "Unlike patent law, rights in trademarks are not gained through discovery or invention of the mark, but only through actual usage." J. Thomas McCarthy, 2 McCarthy on Trademarks & Unfair Competition § 16:11 (4th ed. 2015) (hereinafter, "McCarthy"); *see Blue Bell, Inc. v. Farah Mfg. Co.*, 508 F.2d 1260, 1265 (5th Cir. 1975) ("conception of the mark" does not establish trademark rights at common law).

In sum, FN's sales of SCAR rifles to USSOCOM alone are sufficient to establish FN's priority of use as early as 2004. In addition to this use, FN's marketing efforts establish priority in 2005 and 2006 because they constitute "use

20

analogous to trademark use" and were followed by sales to law enforcement and civilians within a commercially reasonable period of time.[4]

> The foregoing determination is not the end of the inquiry, however, because

> a business does not automatically obtain rights in a mark by using it. A business will obtain rights in a mark upon first use only if the mark is "inherently distinctive." If the mark is not inherently distinctive, a business may obtain rights in the mark when it attains a secondary meaning.

*Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C.*, 931 F.2d 1519, 1522 (11th Cir. 1991) (footnotes omitted); *see also Knights Armament*, 654 F.3d at 1189 ("The party seeking trademark protection must demonstrate that its mark acquired secondary meaning *before* the alleged infringer first began using the mark." (emphasis in original)). The district court found not only that FN's mark acquired distinctiveness through secondary meaning but that it did so at some point prior to Clyde Armory's first sale of SCAR-Stock stocks in September 2006. While Clyde Armory takes issue with the district court's failure to pinpoint an exact date upon which FN's mark attained distinctiveness, all that matters is that it attained such status before Clyde Armory began using SCAR-Stock. For the reasons stated in the next section, we find that the district court did not clearly err in determining that FN's SCAR mark is distinctive and that it acquired that quality prior to September 2006.

---

[4] Clyde Armory does not challenge the "commercially reasonable aspect of the district court's ruling.

### 2. The District Court's Finding that FN's SCAR Mark is Distinctive (and that it Acquired that Status Prior to Clyde Armory's First Use of the SCAR-Stock Mark)

A mark is distinctive when it "serve[s] the purpose of identifying the source of the goods or services." *Knights Armament*, 654 F.3d at 1188. A mark can be distinctive in two ways: "if it either (1) is inherently distinctive or (2) has acquired distinctiveness through secondary meaning." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769, 112 S. Ct. 2753, 2758 (1992) (emphasis deleted). This Court has identified four categories of distinctiveness, listed in descending order of strength: (1) fanciful or arbitrary; (2) suggestive; (3) descriptive; and (4) generic. *Knights Armament*, 654 F.3d at 1188.[5] While arbitrary, fanciful, and suggestive marks are considered inherently distinctive and, therefore, are protectable without a showing of secondary meaning, *see Coach House Rest., Inc. v. Coach & Six Restaurants, Inc.*, 934 F.2d 1551, 1560 (11th Cir. 1991), a descriptive mark is not inherently distinctive, and "receives protection only if it acquires secondary meaning," *Knights Armament*, 654 F.3d at 1188*; see also Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1357 (11th Cir. 2007) ("Some marks are inherently distinctive; some marks, though not inherently distinctive, acquire distinctiveness

---

[5] Fanciful or arbitrary marks "bear no relationship to the product or service," suggestive marks "suggest characteristics of the product or service and require an effort of the imagination by the consumer in order to be understood as descriptive," descriptive marks "identify the characteristic or quality of a product or service," and generic marks "suggest the basic nature of the product or service." *Gift of Learning Found.*, No. 01–08069–CV–DTKH, 2001 WL 34718642, 2001 U.S. Dist. LEXIS 25301 (S.D. Fla. 2001), *aff'd*, 329 F.3d at 797–98.

by becoming associated in the minds of the public with the products or services offered by the proprietor of the mark . . . .”). A descriptive mark has acquired distinctiveness through secondary meaning “when the primary significance of the [mark] in the minds of the [consuming] public is not the product but the producer.” *Welding Servs.*, 509 F.3d at 1358 (internal quotation marks omitted). Four factors determine whether a mark has acquired secondary meaning:

> (1) the length and manner of its use; (2) the nature and extent of advertising and promotion; (3) the efforts made by the plaintiff to promote a conscious connection in the public’s mind between the name and the plaintiff’s product or business; and (4) the extent to which the public actually identifies the name with the plaintiff’s product or venture.

*Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1513 (11th Cir. 1984).

Clyde Armory contends that the district court misapplied all four of these factors in concluding that FN’s SCAR mark was descriptive, but had nonetheless acquired secondary meaning. Distinctiveness and “[t]he existence of secondary meaning” are “question[s] of fact,” and we thus review the district court’s findings on these issues for clear error. *Knights Armament*, 654 F.3d at 1187–88.

### i.    *the length and manner of use*

Clyde Armory contends that, contrary to the finding of the district court, the nearly two-year period in which FN used the SCAR mark in commerce before Clyde Armory introduced the SCAR-Stock mark in September 2006 was not a sufficient amount of time for FN’s mark to acquire distinctiveness through

23

secondary meaning. Relying on § 1052(f) of the Lanham Act, Clyde Armory suggests that a mark cannot acquire distinctiveness in fewer than five years. However, that provision merely affords a presumption of secondary meaning to a party seeking registration of a descriptive term when it can show "substantially exclusive and continuous use thereof as a mark by the applicant in commerce for the five years before the date on which the claim of distinctiveness is made." *See* 15 U.S.C. § 1052(f). Meanwhile, McCarthy describes the five-year duration of use expressed in § 1052(f) as a "purely arbitrary measure" and states that "[t]here is no fixed rule as to the length of time a symbol must be in use before it can achieve secondary meaning." 2 McCarthy § 15:54. Additionally, the Second Circuit has noted that the time necessary to acquire secondary meaning "may be quite short," *Noma Lites, Inc. v. Lawn Spray, Inc.*, 222 F.2d 716, 717 (2d Cir. 1955), and has affirmed a finding of secondary meaning based on only an eleven-month period of use, *Maternally Yours v. Your Maternity Shop*, 234 F.2d 538, 544 (2d Cir. 1956).

Considerable evidence supports the district court's finding that the SCAR mark acquired secondary meaning at some point during the nearly two-year period before Clyde Armory began using SCAR-Stock in September 2006. During that time, FN sold millions of dollars of SCAR rifles to the U.S. military through the USSOCOM contract, and because the USSOCOM solicitation garnered wide interest, FN received extensive media attention as the winner of the bid. *See*

24

*Maternally Yours*, 234 F.2d at 544 (noting that the fact that the plaintiff's "marked success . . . produced widespread and unusual recognition of its name and operation in the national press by the time defendant entered the field" supported the existence of secondary meaning in a short period of time). FN also spent a substantial amount independently promoting its SCAR rifles at hundreds of trade shows, such as the February 2006 SHOT Show where civilian consumers flocked to FN's booth to see the rifle. The evidence supports the district court's conclusion that the public associated the SCAR brand with FN at some point during those two years.

Clyde Armory also argues that FN's use of the SCAR mark prior to September 2006 was not "substantially exclusive" as required under § 1052(f) because the designation SCAR originated with and was simultaneously used by USSOCOM, and because other manufacturers produced prototype weapons bearing the SCAR mark during the USSOCOM competition. However, as noted by the district court, after FN won the competition, it was the only manufacturer actively producing and selling a USSOCOM combat assault rifle described as a SCAR. No other manufacturer's rifles were ever produced or sold, and neither the U.S. military nor any other third party attempted to use SCAR as a trademark in order to sell firearms products. *See Univ. of Ga. Athletic Ass'n v. Laite*, 756 F.2d 1535, 1545 n.27 (11th Cir. 1985) (noting that unauthorized third-party uses are

25

only relevant where there is evidence they "significantly diminish the public's perception that the mark identifies items connected with the owner of the mark").

Finally, Clyde Armory contends that the district court reduced the "length and manner of use" to length alone by failing to find that FN used SCAR merely as a description of the model of firearm it sold instead of as an identifier of the FN SCAR rifle brand. However, the district court's findings of fact previously described show that FN created an association in consumers' minds between the word SCAR and its specific brand of rifle, and thus FN used SCAR as a mark. The district court did not clearly err in finding that FN satisfied the first factor of the test for distinctiveness through secondary meaning.

### ii.    the nature and extent of advertising and promotion

Clyde Armory contends that, while FN's advertising efforts may have been extensive, they failed to actually connect the SCAR mark with FN's rifles. This Court's predecessor has stated that "the question is not the extent of the promotional efforts, but their effectiveness in altering the meaning of [the word] to the consuming public." *Aloe Creme Labs., Inc. v. Milsan, Inc.*, 423 F.2d 845, 850 (5th Cir. 1970), *cert. denied*, 398 U.S. 928, 90 S. Ct. 1818 (1970). However, the same evidence described above belies the contention that FN did not create a connection between SCAR and its company and products through its advertising. The attention FN received after winning the USSOCOM contract increased public

26

awareness of FN's SCAR rifle. Then, FN began spending a substantial amount in 2005 and 2006 advertising its SCAR rifles and distributing SCAR brochures, flyers, T-shirts, hats, and other promotional items bearing the SCAR mark. The district court properly addressed the nature of FN's advertising and publicity.

> ### iii.    *efforts made by the plaintiff to promote a conscious connection between the name and the plaintiff's product or business and the extent to which the public actually identifies the name with the plaintiff's product or venture*

Clyde Armory's arguments with respect to these factors are largely similar to its previous ones and fare no better. Clyde Armory contends that FN did not use SCAR as a trademark but rather as an abbreviation for "Special Operations Forces Combat Assault Rifle." We note that if Clyde Armory is contending that acronyms are not protectable as trademarks, it is incorrect. *See, e.g.*, *Nat'l Cable Television Ass'n, Inc. v. Am. Cinema Editors, Inc.*, 937 F.2d 1572, 1577 (Fed. Cir. 1991) (rejecting contention that "American Cinema Editors" did not have trademark rights in the acronym "ACE"). Moreover, FN used the SCAR mark on the rifles themselves and in other instances without the accompanying phrase "Special Operations Forces Combat Assault Rifle." Next, Clyde Armory contends that the district court clearly erred in finding consumers actually identified SCAR with FN's products. Smith, Clyde Armory's own former Chief Operating Officer, testified that by 2006, SCAR was well-known and uniquely associated with FN,

27

and that in discussing FN's plans to use SCAR-Stock, he expressed concern that the SCAR "name was already taken . . . [b]y FN." As such, the final two factors also support the existence of secondary meaning for the SCAR mark prior to September 2006, as does the district court's finding that Clyde Armory intentionally copied the SCAR mark. *See, e.g.*, *Brooks Shoe Mfg. Co. v. Suave Shoe Corp.*, 716 F.2d 854, 860 (11th Cir. 1983) (while proof of intentional copying is not dispositive, it is probative evidence of secondary meaning); 2 McCarthy § 15:38 (same). Considerable evidence in the record supports the finding that Clyde Armory adopted the mark to take advantage of the popularity of FN's mark on the market. Clyde admitted that he was familiar with FN's products and knew about the SCAR rifle and FN's winning the bid when he adopted the SCAR-Stock mark for use in the same industry. Clyde Armory's former Chief Operating Officer testified that Clyde adopted the SCAR-Stock mark in part to profit from the popularity of FN's mark. The district court found his testimony credible considering Clyde's own admission of knowledge of FN's SCAR. Clyde Armory even laser-engraved its stocks with the mark SCAR-CQB-Stock in the same font, color, and size as the SCAR mark on FN's rifles. The district court did not clearly err in finding that FN's SCAR mark acquired secondary meaning. As a result, we need not review the district court's finding that Clyde Armory acted in bad faith, as that finding was merely an alternative reason that Clyde Armory did not prevail.

28

### C.    The District Court's Partial Grant of Summary Judgment in Favor of FN on Clyde Armory's "Unlawful Use" Defense

Clyde Armory argued[6] at the summary judgment stage that FN cannot rely on its pre-September 2006 advertisements and promotional activities to show use of the SCAR mark because these activities violated federal regulations and thus cannot provide the basis for a protectable trademark interest in SCAR. The district court recognized the existence of what is known as the "unlawful-use doctrine" briefed by the parties but found Clyde Armory's arguments based on the doctrine to be without merit. Clyde Armory now contends that the district court wrongly applied the unlawful use doctrine and thus erred in barring Clyde Armory from pursuing it as a defense at trial.

The "unlawful use doctrine" appears almost exclusively in the administrative setting, originating in United States Trademark Trial and Appeal Board ("TTAB") proceedings to oppose trademark applications or cancel registrations. *See, e.g.*, *In re Garden of Eatin' Inc.*, 216 U.S.P.Q. 355, 357 (T.T.A.B. 1982), 1982 WL 52032, at *2. Since the TTAB interprets the "use in commerce" requirement to mean "lawful use," *see Clorox Co. v. Armour-Dial, Inc.*, 214 U.S.P.Q. 850, 851

---

[6] Clyde Armory asserts that neither party moved for summary judgment on the issue of whether Clyde Armory should be permitted to assert the unlawful use defense and that the district court ruled on the issue *sua sponte*. Clyde Armory does not argue that this constitutes reversible error, and in any event, Clyde Armory is incorrect. The parties fully briefed the issue at the summary judgment stage, and the district court further considered the issue during the parties' motions *in limine* and at the pretrial conference. The parties thus had ample opportunity to be heard on this issue.

(T.T.A.B. 1982), 1982 WL 50434, at *1, it has stated that "the sale or shipment of [a] product under [a] mark ha[s] to comply with all applicable laws and regulations" before a party may claim trademark protection for that mark, *In re Pepcom Indus., Inc.*, 192 U.S.P.Q. 400, 401 (T.T.A.B. 1976), 1976 WL 21138, at *1. A use is unlawful if "the issue of compliance has previously been determined (with a finding of non-compliance) by a court or government agency having competent jurisdiction under the statute involved, or where there has been a per se violation of a statute regulating the sale of a party's goods." *Kellogg Co. v. New Generation Foods, Inc.*, 6 U.S.P.Q.2d 2045, 2047 (T.T.A.B. 1988), 1988 WL 252503, at *3 (citing *Satinine Societa in Nome Collettivo di S.A. e. M. Usellini v. P.A.B. Produits et Appareils de Beaute*, 209 U.S.P.Q. 958 (T.T.A.B. 1981), 1981 WL 48126). The party asserting the defense must establish that it applies by clear and convincing evidence. *Satinine Societa*, 209 U.S.P.Q. at 965, 1981 WL 48126, at *7. Not every violation, however, will be sufficient to justify denial of trademark protection based on unlawful use. There must be a nexus between the use of the mark and the violation, and the violation must be material. *Gen. Mills Inc. v. Health Valley Foods*, 24 U.S.P.Q.2d 1270, 1274 (T.T.A.B. 1992), 1992 WL 296518, at *4 (citing *Satinine Societa*, 209 U.S.P.Q. at 967 (Kera, M., concurring) 1981 WL 48126, at *10). To be material, the violation must be of "such gravity

30

and significance that the usage must be considered unlawful—so tainted that, as a matter of law, it could create no trademark rights." *Id.*, 1992 WL 296518, at *3.

This Court has not adopted the unlawful use doctrine[7] and need not do so today because even if we were to adopt it, Clyde Armory has not submitted evidence sufficient to raise an issue of fact in this respect. Clyde Armory contends that FN's use was unlawful because it violated a regulation called the United States Special Operations Command Federal Acquisition Regulation Supplement ("SOFARS"),[8] which, among other things, prohibits contractors from disclosing unclassified information pertaining to contracts with USSOCOM without prior authorization, *see* SOFARS § 5652.204–9003(a), and provides that the contractor acknowledges that 18 U.S.C. § 701 prohibits the use of the USSOCOM emblem or logo without authorization by USSOCOM, *see* SOFARS 5652.204–9003(e). Clyde Armory contends that FN violated SOFARS by associating itself with USSOCOM in its early promotional materials and advertisements for its SCAR rifle. However, the original contract between FN and USSOCOM did not even contain the

---

[7] A district court in this Circuit has applied the defense in the context of a trademark cancellation, not infringement. *See Davidoff Extension S.A. v. Davidoff Int'l, Inc*., 612 F. Supp. 4, 7–8 (S.D. Fla. 1984). The district court found the clear and convincing requirement not met. *See id.*

[8] Clyde Armory provides no citation for this regulation, but FN has included the text of the regulation in its Supplemental Appendix filed with this Court. Although Clyde Armory represented to the district court that the regulation is part of the Federal Acquisition Regulation System and was codified at Title 48 of the United States Code of Federal Regulations, Chapter 56, the Court is unable to find the cited provisions. Nonetheless, the Court relies on the text of the regulation as set forth in the Supplemental Index.

language of SOFARS, nor has Clyde Armory established that the regulation was in effect in 2006. Indeed, on May 14, 2010, USSOCOM notified FN that SOFARS § 5652.204–9003 provides that release of unclassified information related to USSOCOM contracts requires prior written authorization. However, USSOCOM further explained that "this guidance was not made clear in the contract, as the applicable contract clause that identifies this guidance had not yet been established at the time of the contract award. Therefore, a unilateral modification to the contract incorporating SOFARS clause 5652.204–9003 will be issued." Because USSOCOM acknowledged that the guidance regarding the applicability of this regulation to FN's contract was unclear, the Court cannot find that FN's advertisements in 2006 constituted a *per se* violation of federal regulations. Clyde Armory's other unlawful use argument rests upon 18 U.S.C. § 701, a criminal statute that prohibits the unauthorized private use of any governmental insignia. Clyde Armory points to two instances where FN allegedly violated that statute by using a USSOCOM emblem on SCAR brochures. The district court found that Clyde Armory failed to show that FN's alleged violation of this statute was material to FN's development of trademark rights in SCAR. We agree. Use of an emblem on two of a multitude of promotional materials is at best *de minimus* and not "of such gravity and significance that the usage must be considered unlawful— so tainted that, as a matter of law, it could create no trademark rights." *Gen. Mills*,

32

24 U.S.P.Q.2d at 1274, 1992 WL 296518, at \*3. The district court's rejection of Clyde Armory's unlawful use defense is due to be affirmed.

### D.     The District Court's Decision to Hold a Bench Trial

Clyde Armory argues it was entitled to a jury trial as of right under Fed. R. Civ. P. 38. However, Rule 38 provides for a jury trial only where the right is "declared by the Seventh Amendment to the Constitution" or "provided by a federal statute." Fed. R. Civ. P. 38(a). Rule 39(a) clarifies that, when a jury trial is demanded, the action must be tried by a jury on all issues so demanded "unless . . . the court, on motion or on its own, finds that on some or all of those issues there is no federal right to a jury trial." Fed. R. Civ. P. 39(a)(2). Determining whether a right to a jury trial exists turns on whether the claims were historically cognizable at law or considered equitable. *Phillips v. Kaplus*, 764 F.2d 807, 813 (11th Cir. 1985). "For those claims which traditionally were cognizable at law, the right to a jury is generally preserved; for those claims which historically were considered equitable, no jury trial is mandated." *Id.* In particular, a right to a jury trial does not exist for suits seeking only injunctive relief, which is purely equitable in nature. *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 719, 119 S. Ct. 1624, 1643 (1999); *CBS Broad., Inc. v. EchoStar Commc'ns Corp.*, 450 F.3d 505, 517 n.25 (11th Cir. 2006).

33

Although both FN and Clyde Armory originally sought legal relief in the form of damages and the other party's profits, they both expressly waived all legal claims in their joint proposed pretrial order and orally at the pretrial conference, choosing instead to seek only vindication of their trademark rights and pursue injunctive relief, thus extinguishing any right to a jury trial. As the Fifth Circuit determined, and we agree, "[t]he right to trial by jury is determined by the issues, not by the pleadings." *Armco, Inc. v. Armco Burglar Alarm Co.*, 693 F.2d 1155, 1158 (5th Cir. 1982). Nothing more formal in the way of withdrawal or waiver of the jury trial right was required. *See Morro*, 117 F.3d at 515 (an issue is waived "by failing to ensure that the issue is clearly preserved in the pretrial order"). Thus, "a pretrial order supersedes the pleadings," thereby "eliminating" any claims not preserved in the pretrial order. *State Treasurer of Mich. v. Barry*, 168 F.3d 8, 9–10 (11th Cir. 1999). Because Clyde Armory was simply not entitled to a jury trial under Rule 38, the district court correctly granted FN's motion to strike the jury demands and did not abuse its discretion in denying Clyde Armory's motion to amend the proposed pretrial order, as discussed below.

### 1. The District Court's Grant of FN's Motion to Strike the Jury Demands

Rule 39 provides, "In an action not triable of right by a jury, the court, on motion or on its own: (1) may try any issue with an advisory jury; or (2) may, with the parties' consent, try any issue by a jury whose verdict has the same effect as if

34

a jury trial had been a matter of right . . . ." Fed. R. Civ. P. 39(c). Thus, to have a trial by a non-advisory jury in a purely equitable proceeding, both parties must consent. *See Wilson v. City of Aliceville*, 779 F.2d 631, 635 n.3 (11th Cir. 1986) (citing Fed. R. Civ. P. 39(c)). Here, although the parties originally requested a jury trial, FN later withdrew its consent by moving to strike the jury demands. Because this Court has not addressed the propriety of withdrawing consent to a jury trial when the matters to be tried are purely equitable, the district court looked to a Seventh Circuit decision holding that a district court's grant of a motion to strike a jury demand after initial consent was proper where the party seeking a jury trial provided no reason why she would be prejudiced by a bench trial. *See Kramer v. Banc of Am. Sec., LLC*, 355 F.3d 961, 968 (7th Cir. 2004).

In *Kramer*, the defendant successfully moved shortly before trial to exclude the plaintiff's compensatory and punitive damages claims, thus eliminating any legal claims, and simultaneously moved to strike the jury demand. *Id.* at 967. Because no legal issues remained, the Seventh Circuit held that the demand for a jury, even if established on consent, did not preclude the defendant from withdrawing that consent on the eve of trial. *Id.* at 967–68. Instead, the court noted that Rule 38(d) precludes withdrawing a jury demand only where there is the right to a jury trial, *id.* at 968; *see also* Fed. R. Civ. P. 38(d), and it also reasoned that

35

nothing in Rule 39 restrains a party from withdrawing its consent to a jury trial that is not as of right, *id.*; *see also* Fed. R. Civ. P. 39.

We agree with *Kramer*'s reasoning and holding. When no right to a jury trial exists and where no prejudice will result, a party may unilaterally withdraw its consent to a jury trial. We are also persuaded by the Fifth Circuit's discussion in *Armco*, in which the defendant demanded a jury trial based on the plaintiff's claims for legal relief—trademark infringement damages. 693 F.2d at 1158. The plaintiff moved to strike the defendant's jury demand "[o]n the eve of trial" because the plaintiff no longer sought legal relief. *Id.* The district court proceeded with an advisory jury pursuant to Rule 39(a)(2), and later entered judgment contrary to the jury's findings. *Id*. On appeal, the defendant complained it was deprived of its right to a jury trial, but the Fifth Circuit disagreed, noting that the issues, not the pleadings, determine whether a right to a jury trial exists. *Id.*

Clyde Armory argues that it was prejudiced by the striking of the jury demands because the test for trademark distinctiveness involves a number of considerations for which a jury would seem better suited than a judge. While perhaps the nature of the issues is one relevant consideration, there is no authority stating that a jury is required to determine acquired distinctiveness, and this Court cannot say that the district court erred in finding that, under the facts and issues to be decided at trial, Clyde Armory would not be prejudiced by a bench trial. Nor did

36

the timing of FN's request cause Clyde Armory prejudice. Rule 39(a)(2) contains no time limit for the filing of an objection to the demand for a jury trial. This Court has affirmed a district court's striking a jury demand "days before trial" without any consideration of prejudice because no right to a jury existed where only equitable relief was sought. *See CBS Broad., Inc*., 450 F.3d at 517 n.25. The district court correctly granted FN's motion to strike the jury demands.

### 2. The District Court's Denial of Clyde Armory's Motion to Amend the Proposed Pretrial Order to Reinstate its Demand for FN's Profits

After the district court struck the jury demand, Clyde Armory moved to amend the proposed pretrial order to reinstate its demand for profits, believing that such a demand for profits would implicate a right to a trial by jury. The district court denied this motion. This Court has "not hesitated to back up district courts when they put steel behind the terms of pretrial orders and hold parties to them." *Morro*, 117 F.3d at 515. As such, we will "not disturb the trial court's ruling unless it is demonstrated that the trial court has so clearly abused its discretion that its action could be deemed arbitrary." *Id.* at 516; *see also Hodges*, 597 F.2d at 1018 ("[F]or pretrial procedures to continue as viable mechanisms of court efficiency, appellate courts must exercise minimal interference with trial court discretion in matters such as the modification of its orders."); *Del Rio Distrib., Inc. v. Adolph Coors Co.*, 589 F.2d 176, 178 (5th Cir. 1979) ("This court has previously

37

recognized that the trial judge is vested with broad discretion in determining whether or not a pre-trial order should be modified or amended.").[9]

Under the particular facts of this case we cannot say that the district court's actions were arbitrary, and consequently, we deny Clyde Armory's claim of error in this regard. Clyde Armory waived its claim for profits by failing to preserve it in the pretrial order. *See Morro*, 117 F.3d at 515–16. We also note that any prejudice Clyde Armory asserts from the court's denial of its motion is a "direct result of [its] own failure to properly present its case." *Morro*, 117 F.3d at 516 (citing *Hodges*, 597 F.2d at 1018); *see also Del Rio Distrib.*, 589 F.2d at 178–79 (same).[10]

## III.    CONCLUSION

For the foregoing reasons, we affirm the district court on all issues raised on appeal.

**AFFIRMED.**

---

[9] Clyde Armory does not argue that the standard for allowing amendment is different because the district court had not entered the proposed pretrial order at the time Clyde Armory moved to amend it.

[10] Because we so hold, we need not reach the issue of whether recovery of profits under § 1117(a) of the Lanham Act is an equitable remedy for which there is no right to a jury trial.